UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| NRRM, LLC, | ) | |
| | ) | |
|     Plaintiff/Counter-Defendant/Cross- | ) | 10 C 4642 |
|     Defendant/Counter-Cross Plaintiff, | ) | |
| | ) | Judge Feinerman |
|     and | ) | |
| | ) | |
| MARK TRAVIS and NICHOLAS HAMILTON, | ) | |
| | ) | |
|     Plaintiffs/Counter-Defendants/Cross- | ) | |
|     Defendants, | ) | |
| | ) | |
|     vs. | ) | |
| | ) | |
| MEPCO FINANCE CORPORATION, | ) | |
| | ) | |
|     Defendant/Counter-Plaintiff/Third- | ) | |
|     Party Plaintiff, | ) | |
| | ) | |
|     vs. | ) | |
| | ) | |
| CHOICE MANUFACTURING CO. INC., | ) | |
| | ) | |
|     Third-Party Defendant/Counter- | ) | |
|     Third-Party Plaintiff/Cross-Plaintiff/ | ) | |
|     Counter-Cross Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

This litigation arises from a three-way business deal gone, if the case caption is any indication, terribly wrong. Choice Manufacturing administers automobile service and repair warranties; NRRM was a Choice sales agent that marketed and sold the warranties to customers; and Mepco Finance offered financing to customers who wanted to pay for the warranties in installments. (Two of NRRM's member-managers are also parties, but their presence is immaterial for present purposes.) Each party accuses the others of breaching their respective agreements. Docs. 58, 66, 76, 77. Trial is set for September 14, 2015. Doc. 198.

Before the court are several motions. Mepco has moved to enforce its purported settlement agreement with NRRM, Doc. 157, and for a protective order against NRRM's new discovery requests, Doc. 173. Mepco also has moved for summary judgment on its breach claim against Choice, Doc. 152, and, relatedly, for leave to file short supplemental brief and an amended Local Rule 56.1(a)(3) statement in support of summary judgment, Doc. 186. NRRM has moved for summary judgment against Choice on Choice's contractual claim for attorney fees. Doc. 139.

NRRM's summary judgment motion is granted, as are Mepco's motions to enforce its settlement agreement with NRRM and for a protective order. Mepco's motion to file an amended Local Rule 56.1(a)(3) statement is granted, and its summary judgment motion is entered and continued to allow Choice to respond to the amended Local Rule 56.1(a)(3) statement pursuant to Local Rule 56.1(b)(3)(B) and to file, if it wishes, a new brief opposing summary judgment.

## Background

The following facts are set forth as favorably to Choice, the non-movant on both summary judgment motions, as the record and Local Rule 56.1 permit. *See Hanners v. Trent*, 674 F.3d 683, 691 (7th Cir. 2012). The court assumes the truth of those facts, but does not vouch for them. *See Smith v. Bray*, 681 F.3d 888, 892 (7th Cir. 2012). That said, many of the facts are undisputed, either by agreement or because the fact simply quotes a document.

Much of the relevant background is set forth in the court's previous summary judgment opinion in this case. Doc. 135 (published at 2013 WL 4537391 (N.D. Ill. Aug. 27, 2013)). To simplify greatly, Choice administers vehicle warranties, under which customers pay a fixed up-front fee in exchange for automobile repairs and service over the terms of the warranty. 2013

WL 4537391, at *1.  Choice does not sell directly to customers; instead, it uses sales agents, one of which was NRRM.  *Ibid*.  Customers who wished to purchase Choice's warranties through NRRM had the option of financing their purchase through Mepco.  *Ibid*.  Under the agreements Mepco signed with Choice (the "Administrator Agreement") and NRRM (the "Dealer Agreement"), Mepco would pay Choice and NRRM the full price of the warranty up front in exchange for receiving the customer's monthly payments.  *Id*. at *1-2.  If the customer defaulted on his payments or canceled the warranty, § 4 of the Mepco-NRRM Dealer Agreement provided:

> [NRRM] shall be obligated to refund Mepco the following amount: (1) the amount financed by Mepco [(that is, the full up-front price)]; plus (2) any late payment charges due to Mepco; *less* (3) payments Mepco received from the [customer]; *less* (4) any amounts received by Mepco from [Choice] with respect to the canceled [financing plan].

Doc. 140-1 at 6, 12 (emphases added).

But if NRRM—or, for that matter, any other of Choice's Dealers who signed similar agreements with Mepco—failed to fulfill its § 4 obligation to make Mepco whole, "Paragraph 7 of [Choice and Mepco's] Administrator Agreement required Choice to indemnify Mepco."  2013 WL 4537391, at *2.  Section 9(e) of the Mepco-NRRM Dealer Agreement provided:

> (e) *Prevailing Party Costs*.  The prevailing parties in any litigation in connection with this Agreement shall be entitled to recover from the non-prevailing party all costs and expenses, including, without limitation, reasonable attorneys' and paralegals' fees and costs incurred by such party in connection with any such litigation.

Doc. 144 at p. 2, ¶ 1; Doc. 140-1 at 9, 15.  Although Choice was not a signatory to the Dealer Agreement, Doc. 144 at p. 2, ¶ 2, the Dealer Agreement provided that "[t]he Agreement is entered into between [NRRM] and Mepco for the exclusive benefit of [Choice] and Mepco and their respective successors and permitted assigns and is expressly not intended for the benefit of any other party."  Doc. 144 at p. 3, ¶ 1; Doc. 140-1 at 9, 15.

In July 2010, NRRM sued Mepco for breaching the Dealer Agreement. Doc. 4. Mepco counterclaimed and filed a third-party complaint against Choice, including on warranties financed by Mepco but sold by agents other than NRRM. Doc. 16. Choice filed a cross-claim against NRRM. Doc. 28. NRRM responded by filing a counter-cross-claim against Choice. Doc. 36. The parties amended their pleadings in 2011. Docs. 55, 58, 66-68, 76-79. After some discovery, Mepco moved for summary judgment as to liability on its counterclaims against NRRM and its third-party claims against Choice. Docs. 91, 93.

On May 30, 2013, while Mepco's motions were pending, NRRM's lawyer emailed Mepco's lawyer a settlement offer. Doc. 159 at ¶ 1. The "only material terms for the offer," in the words of NRRM's lawyer, were:

1. Total amount $2.25 million.

2. 12.5 years to pay in equal monthly installments.

3. Cure period of 15 days after written notice if there ever is any issue with payment.

4. Mutual releases.

5. Dismissal of lawsuit with prejudice.

*Ibid*.; Doc. 159-1 at 5, 9. Mepco's lawyer accepted NRRM's offer later that day, replying: "Mepco will accept the offer subject to a formal written agreement with customary terms." Doc. 159 at ¶ 2; Doc. 159-1 at 5, 8. NRRM's lawyer confirmed in a June 5 email: "We have an agreement between NRRM and Mepco with payments to begin August 1. Obviously full releases and dismissals." Doc. 159 at ¶ 3; Doc. 159-1 at 8. On or about June 10, 2013, NRRM's counsel informed the court that a settlement had been reached, Doc. 159 at ¶ 4, and the court accordingly said that it would deny as moot Mepco's motion for summary judgment against NRRM and also its motion for summary judgment against Choice as to the portion of Mepco's

third-party claims arising from the NRRM contracts, Doc. 131. At an August 28, 2013 status hearing, NRRM's and Mepco's counsel confirmed that the parties had settled. Doc. 136.

Meanwhile, the court denied the surviving part of Mepco's summary judgment motion—which concerned the portion of Mepco's third-party claims arising from the non-NRRM warranties—for failure to adduce admissible evidence supporting a grant of summary judgment. Doc. 134; 2013 WL 4537391 at *4-5. Now before the court are Mepco's motions to enforce its settlement agreement with NRRM, Doc. 157, and for a protective order against NRRM's new discovery requests, Doc. 173. Mepco has also again moved for summary judgment on its breach claim against Choice, Doc. 152, and, relatedly, for leave to file an amended Local Rule 56.1(a)(3) statement in support of its summary judgment motion, Doc. 186. NRRM has moved for summary judgment against Choice on Choice's contractual claim for attorney fees. Doc. 139.

## Discussion

### I. NRRM v. Choice

NRRM and Choice each sought in this lawsuit to force the other to pay Mepco for the losses that Mepco allegedly incurred. Once NRRM and Mepco settled, however, the dispute between NRRM and Choice was rendered largely moot, for as a result of the settlement, Mepco abandoned all of its claims against Choice related to warranties sold by NRRM. (Mepco's pending motion for summary judgment against Choice relates only to warranties allegedly sold by another of Choice's sales agents.) Choice's potential liability to Mepco on the NRRM warranties having evaporated, its only remaining claim against NRRM is its bid for contractual attorney fees. NRRM seeks summary judgment on that claim.

As an initial matter, Choice correctly points out that NRRM did not comply with Local Rule 56.1(a)(3). Doc. 143 at 2-3. For one thing, NRRM did not file a separate Local Rule

56.1(a)(3) statement of facts, but simply included it in its memorandum. The local rules do not explicitly prohibit this, but Judge Castillo's seminal decision in *Malec v. Sanford*, 191 F.R.D. 581 (N.D. Ill. 2000), does. *Id.* at 585 ("A final word about the 56.1 statement of facts. It is a document separate from the supporting memorandum; it is neither a supplement to nor a surrogate for the memo."); *see also Sagar Megh Corp. v. United Nat'l Ins. Co.*, 2013 WL 5951771, at *2 (N.D. Ill. Nov. 6, 2013) (same). But this non-substantive and purely formal violation does not impede the court's consideration of NRRM's motion, and thus will be overlooked.

The court also will overlook the second flaw noted by Choice—NRRM's failure to include in its Local Rule 56.1(a)(3) statement any of the required facts describing the parties and supporting venue and jurisdiction. *See* N.D. Ill. L.R. 56.1(a)(3)(A) & (B). Although early in this litigation (and in response to the court's show cause order) NRRM *alleged* facts supporting diversity jurisdiction, Docs. 49, 51, it has not adduced *evidence* supporting those allegations, as required at the summary judgment stage. *See Szabo v. Bridgeport Machines, Inc.*, 249 F.3d 672, 676 (7th Cir. 2001) (noting that district courts should not merely "accept the plaintiff's say-so" about facts concerning subject matter jurisdiction, but should instead demand competent evidence). That said, Choice has never disputed the parties' respective citizenships. In its amended answer, Choice admitted that it "is a New Jersey corporation with its principal place of business … [in] New Jersey," Doc. 66 at p. 3, ¶ 6; *id.* at p. 22, ¶ 1; *id.* at p. 26, ¶ 1, and affirmatively declared "[u]pon information and belief" that "Mepco is a Michigan corporation with its principal place of business in Chicago, Illinois," *id.* at p. 22, ¶ 2, and that "NRRM is a Missouri limited liability company … and all of its members are citizens of Missouri," *id.* at p. 26, ¶ 2. Nor has Choice disputed that the parties seek millions of dollars from each other, well

above the $75,000 amount-in-controversy threshold.  The court is therefore satisfied that it has subject matter jurisdiction under 28 U.S.C. § 1332(a).

More troubling is an issue that Choice does not raise, which is NRRM's directly citing raw record material, rather than its Local Rule 56.1(a)(3) statement, in its summary judgment brief—a practice long disapproved by this court.  *See Mervyn v. Nelson Westerberg, Inc.*, __ F. Supp. 3d __, 2014 WL 7177614, at *4 (N.D. Ill. Dec. 16, 2014) (collecting cases); *Thorncreek Apartments III, LLC v. Vill. of Park Forest*, 970 F. Supp. 2d 828, 838-39 (N.D. Ill. 2013); *LaSalvia v. City of Evanston*, 806 F. Supp. 2d 1043, 1046 (N.D. Ill. 2011); *Solaia Tech. LLC v. ArvinMeritor, Inc.*, 361 F. Supp. 2d 797, 826-27 (N.D. Ill. 2005); *Madaffari v. Metrocall Cos. Grp. Policy GL, H-21163-0, Plan No. 501*, 2005 WL 1458071, at *1 (N.D. Ill. June 15, 2005). But the only citations to raw record material in NRRM's brief are to the two short contracts at the heart of this dispute.  Doc. 140 (citing Doc. 140-1).  Because this violation is harmless, as it did not impede the court's consideration of the parties' substantive arguments, the court will overlook it as well.  *See Mervyn*, 2014 WL 7177614, at *5 (overlooking Local Rule 56.1 violations when considering non-fact-intensive issues); *see also Stevo v. Frasor*, 662 F.3d 880, 887 (7th Cir. 2011) ("it is clear that the decision whether to apply [Local Rule 56.1] strictly or to overlook any transgression is one left to the district court's discretion") (internal quotation marks omitted); *Little v. Cox's Supermarkets*, 71 F.3d 637, 641 (7th Cir. 1995) (same); *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 923 (7th Cir. 1994) (same).

Choice's bid for attorney fees relies on § 9(e) of the NRRM-Mepco Dealer Agreement, which provides that "[t]he prevailing parties in any litigation in connection with this Agreement shall be entitled to recover from the non-prevailing party all costs and expenses, including" attorney fees.  Doc. 140 at p. 3, ¶ 1; Doc. 140-1 at 9.  The parties agree that Illinois law governs.

NRRM denies neither that this lawsuit qualifies as "litigation in connection with this Agreement," nor that Choice is an explicit third-party beneficiary of the Dealer Agreement writ large. Doc. 140 at 7; *see Olson v. Etheridge*, 686 N.E.2d 563, 566 (Ill. 1997) ("if a contract is entered into for the direct benefit of a third person, the third person may sue for a breach of the contract in his or her own name, even though the third person is a stranger to the contract and the consideration"). Rather, NRRM argues that Choice is not an intended beneficiary of the Dealer Agreement's *fee-shifting provision*. Doc. 140 at 7-11; *see Estate of Willis v. Kiferbaum Constr. Corp.*, 830 N.E.2d 636, 643 (Ill. App. 2005) ("A third party has no rights to damages from a breach of a contract entered into by others unless the agreed-to *provision* was intentionally included for the direct benefit of the third party.") (emphasis added); *Weil, Freiburg & Thomas, P.C. v. Sara Lee Corp.*, 577 N.E.2d 1344, 1352 (Ill. App. 1991) ("A third party acquires no rights under a contract entered into by others unless *the provision at issue* was intentionally included for the direct benefit of the third party.") (emphasis added).

"Illinois follows the 'American rule,' which prohibits prevailing parties from recovering their attorney fees from the losing party, absent express statutory or contractual provisions." *Sandholm v. Kuecker*, 962 N.E.2d 418, 435 (Ill. 2012); *see Fednav Int'l Ltd. v. Cont'l Ins. Co.*, 624 F.3d 834, 839 (7th Cir. 2010) (same). Illinois law also holds that "contractual provisions providing for attorney fees should also be strictly construed." *Negro Nest, LLC v. Mid-N. Mgmt., Inc.*, 839 N.E.2d 1083, 1085 (Ill. App. 2005) (citing *Helland v. Helland*, 573 N.E.2d 357, 359 (Ill. App. 1991)); *see Rexam Beverage Can Co. v. Bolger*, 620 F.3d 718, 734 (7th Cir. 2010) ("[Illinois] courts strictly construe contractual provisions permitting the award of attorneys' fees[.]").

Illinois courts tend to rigorously apply the "strictly construed" directive. *See*, *e.g.*, *Negro Nest*, 893 N.E.2d at 1085-86 (holding that a contractual provision providing for "all collection costs" did not include attorney fees); *Helland*, 573 N.E.2d at 359-60 (holding that a contractual provision providing for attorney fees "upon or after default" did not allow for the recovery of fees incurred after the defaulting party cured the default); *Zimmerman v. First Prod. Credit Ass'n*, 412 N.E.2d 216, 217-18 (Ill. App. 1980) (holding that a provision allowing for attorney fees "incurred in enforcing any of the obligations" in the contract did not allow the recovery of fees in a declaratory judgment action, because such an action sought "only a declaration of rights and not an enforcement of the obligations of the" contract). The Seventh Circuit is not quite as unforgiving. *See*, *e.g.*, *Rexam Beverage Can Co. v. Bolger*, 620 F.3d 718, 735-36 (7th Cir. 2010) (Illinois law) (holding that an indemnity clause providing for attorney fees was not restricted to indemnification claims by third parties); *Jannotta v. Subway Sandwich Shops, Inc.*, 225 F.3d 815, 818 (7th Cir. 2000) (Illinois law) (holding that a contractual provision allowing for attorney fees in any litigation "relative to the rights and obligations of the parties" under the contract included litigation for fraudulent inducement); *compare Negro Nest*, 893 N.E.2d at 1086 (state appellate court decision holding that "all collection costs" did not include attorney fees, and disagreeing with the Seventh Circuit's conclusion to the contrary in *Boulevard Bank Nat'l Ass'n v. Philips Med. Sys. Int'l B.V.*, 15 F.3d 1419 (7th Cir. 1994) (Illinois law)).

Yet even the relatively generous Seventh Circuit, consistent with Illinois's rule establishing "a strong presumption against creating contractual rights in third parties," *Shank v. H.C. Fields*, 869 N.E.2d 261, 268 (Ill. App. 2007), has been unwilling to construe fee-shifting provisions in favor of third-party beneficiaries. In *Rissman v. Rissman*, 229 F.3d 586 (7th Cir. 2000), the Seventh Circuit refused to allow a prevailing defendant to collect attorney fees

pursuant to a contractual fee-shifting clause on the ground that he had "signed the contract exclusively in his capacity as trustee of the Tiger Stock Trust," yet was "sued exclusively in his individual capacity." *Id.* at 588 (Illinois law). That is a mighty fine distinction—and emphasizes the care with which this court must construe § 9(e).

Other courts that have considered the rights of third-party beneficiaries to enforce contractual fee-shifting provisions are similarly cautious, applying what could be called a reciprocity principle. As California's appellate court explained:

> A party is entitled to recover its attorney's fees pursuant to a contractual provision only when the party would have been liable for the fees of the opposing party if the opposing party had prevailed. Where a nonsignatory plaintiff sues a signatory defendant in an action on a contract and the signatory defendant prevails, the signatory defendant is entitled to attorney's fees only if the nonsignatory plaintiff would have been entitled to its fees if the plaintiff had prevailed.

*Real Prop. Servs. Corp. v. City of Pasadena*, 30 Cal. Rptr. 2d 536, 541 (Cal. App. 1994). In *Rissman*, the Seventh Circuit implicitly invoked reciprocity in explaining why a second prevailing defendant, who *was* a party to the contract, could recover attorney fees; the court noted that because the fee-shifting clause's applicability "would be clear enough if [the second defendant] had been the one to sue [the plaintiff]," the second defendant was entitled to seek fees given that it was he who had been sued unsuccessfully by the plaintiff. 229 F.3d at 588. This notion of reciprocity, under which a third-party beneficiary can invoke a fee-shifting provision only if it, too, could be held liable under the provision were the shoe on the other foot, accords with this more general principle of Illinois law: "[I]f the plaintiff is relying on a third party beneficiary theory, then it is clear that he must take the contract as the original parties made it. *If he is a beneficiary, then he is bound by all of its provisions.* He cannot take those parts of the contract which favor him and reject those parts which distress him." *L. B. Herbst Corp. v. N. Ill. Corp.*, 241 N.E.2d 125, 127 (Ill. App. 1968) (emphasis added).

Thus, Choice may benefit from the Mepco-NRRM Dealer Agreement's fee-shifting clause only if it also could be held liable under it. Yet if the tables were turned, the court would have little difficulty concluding that Choice—a non-signatory to the Dealer Agreement—could never be liable for NRRM's attorney fees under § 9(e). And if Choice need not suffer § 9(e)'s burdens, then it cannot take advantage of its benefits. Choice is therefore not entitled to attorney fees under the Dealer Agreement. *See Ward v. Siebel Living Trust*, 449 F. App'x 747, 751-52 (10th Cir. 2011) (holding that only the parties to the contract were entitled to attorney fees, where the contract provided that in "litigation concerning this contract, costs and reasonable attorney fees shall be awarded to the prevailing party"); *Hub Elec. Co. v. Gust Constr. Co.*, 585 F.2d 183, 188-89 (6th Cir. 1978) ("Even if Hub is a third-party beneficiary of some portions of the contract, … it does not follow that Hub is entitled to 'stand in the shoes' of the school district and receive the benefit of *all* of the provisions of the original contract. In short, Hub is not the 'person for whose benefit [the attorney fees] promise is made by way of contract.'") (alteration and emphasis in original); *Int'l Bhd. of Elec. Workers, Local Union No. 134 v. Chicago & Ne. Ill. Dist. Council of Carpenters*, 149 F. Supp. 2d 452, 459 (N.D. Ill. 2001) ("[T]he Standard Agreement's reference to 'the prevailing party' logically refers to whichever signatory to the contract prevailed, not to a third party beneficiary."); *Wardley Corp. v. Welsh*, 962 P.2d 86, 92 (Utah App. 1998) ("We have examined the contract as a whole and located the words 'party' and 'parties' in a variety of provisions. In these contract provisions, those words are used in a way that can logically refer only to the direct parties to the contract—Welsh, the seller, and Peterson, the buyer—not to the potentially much larger group of parties to the litigation growing out of the contract. … Harmonizing all the terms of this contract, we conclude the words 'party' and 'parties' refer only to the signatories to the contract—Welsh and Peterson. Only Welsh and

Peterson therefore may enforce the attorney fees provision against each other."); *Real Prop. Servs. Corp.*, 30 Cal. Rptr. 2d at 541.

Noting that § 9(e) begins by mentioning the "prevailing *parties*" (plural) to the litigation, Choice responds that "[i]f that fee-shifting provision only applied to two parties—NRRM and Mepco—it would make no sense for the provision to refer to multiple 'prevailing parties' in litigation," Doc. 143 at 5. Yet § 9(e)'s single sentence ends by providing for recovery of fees and costs "incurred by *such party*" (singular), a grammatical inconsistency that leads the court to conclude that the singular/plural distinction sheds no light on the provision's meaning. In any event, even had the plural been used throughout, it would not be enough to overcome the reciprocity principle described above, for it would be absurd to hold Choice potentially liable for attorney fees (a precondition of its being able to recover them) based solely on whether two other parties used a singular or plural noun in a contract that Choice never signed.

Alternatively, Choice suggests that the contract is at least ambiguous enough to survive summary judgment. *See BKCAP, LLC v. CAPTEC Franchise Trust 2000-1*, 572 F.3d 353, 362 (7th Cir. 2009) ("Because the contract language defining the Prepayment Premium is ambiguous, resolving the meaning of the contract on summary judgment was inappropriate."); *Hickey v. A.E. Staley Mfg.*, 995 F.2d 1385, 1389 (7th Cir. 1993) ("Summary judgment should be entered only if the pertinent provisions of the contractual documents are unambiguous; it is the lack of ambiguity within the express terms of the contract that forecloses any genuine issues of material fact.") (internal quotation and alteration marks removed). The court disagrees. Viewed against the above-cited authorities, the fee-shifting provision is unambiguous: Only the Dealer Agreement's signatory parties may be held liable for—and therefore may, in reciprocal fashion, be able to recover—attorney fees under § 9(e).

This disposition renders it unnecessary to reach NRRM's other arguments in favor of summary judgment against Choice.

## II.     NRRM v. Mepco

### A.     Mepco's Motion to Enforce Its Settlement with NRRM

In opposing the enforcement of its settlement with Mepco, NRRM argues that the settlement was contingent on Choice's dropping its claims against NRRM.  Doc. 164 at 1-2, 4-6.  Mepco disagrees.  Docs. 158, 171.  But the dispute may be moot, for NRRM asserts in its brief: "If NRRM wins [its summary judgment] motion [against Choice], Choice's claims are dismissed, and the settlement's contingency is fulfilled, thus avoiding any need to decide whether the settlement includes the contingency in the first place."  Doc. 164 at 6 n.2.  This concession, along with the court's granting of NRRM's summary judgment motion, means that NRRM no longer contests the settlement agreement's enforceability.  So the settlement agreement is enforceable.

The analysis could stop here, but the court adds that even had NRRM not conceded this, or even had the court denied NRRM's summary judgment motion, the NRRM-Mepco settlement agreement still would be enforceable.  Both parties agree that Illinois law governs.  "A settlement agreement is a contract and as such, the construction and enforcement of settlement agreements are governed by principles of local law applicable to contracts generally."  *Laserage Tech. Corp. v. Laserage Labs., Inc.*, 972 F.2d 799, 802 (7th Cir. 1992) (Illinois law).  "Under Illinois state law, an enforceable contract requires an offer, acceptance, consideration, and mutual assent."  *Nat'l Prod. Workers Union Ins. Trust v. Cigna Corp.*, 665 F.3d 897, 901 (7th Cir. 2011) (Illinois law) (citing *Voelker v. Porsche Cars N. Am., Inc.*, 353 F.3d 516, 528 (7th Cir. 2003), and *Acad. Chicago Publishers v. Cheever*, 578 N.E.2d 981, 984 (Ill. 1991)).  An "agreement to settle will be enforced as long as there is clearly an offer and acceptance of the

compromise and a meeting of the minds as to the terms of the agreement." *Wilson v. Wilson*, 46 F.3d 660, 666 (7th Cir. 1995) (Illinois law) (internal quotation marks omitted) (quoting *Brewer v. Nat'l R.R. Corp.*, 628 N.E.2d 331, 335 (Ill. App. 1993), *rev'd on other grounds*, 649 N.E.2d 1331 (Ill. 1995)); *see Autera v. Robinson*, 419 F.2d 1197, 1201 n.17 (D.C. Cir. 1969) ("a valid settlement agreement, once reached, cannot be repudiated by the parties"). Where, as here, "the basic facts are not in dispute, the existence of a contract is a question of law." *Echo, Inc. v. Whitson Co.*, 121 F.3d 1099, 1102 (7th Cir. 1997) (Illinois law) (citing *Cottingham v. Nat'l Mut. Church Ins. Co.*, 124 N.E. 822, 825 (Ill. 1919)).

NRRM does not dispute that its lawyer's May 30 email, Mepco's response the same day, and NRRM's June 5 confirmation all suffice to establish the formation of a valid contract. Doc. 164 at 3 ("Mepco accepted NRRM's settlement offer the day it was made, and NRRM's counsel confirmed the deal six days later, on June 5."); *id.* at 4 ("Mepco and NRRM initially had a deal, as their email exchange demonstrates."). Rather, NRRM argues that the fourth material term it offered—"[m]utual releases"—included not only NRRM's and Mepco's releasing of claims against each other, but also Choice's releasing its claims against NRRM. Not so, says Mepco: "When two parties agree to enter into a mutual release, they agree to release their claims against one another, without regard for claims that may be held by a third party. That is the objective and uniformly understood meaning of the term *mutual release*." Doc. 158 at 8.

The court agrees that Mepco's is indeed the common and generally accepted definition of "mutual release." *See Black's Law Dictionary* 1480 (10th ed. 2014) (defining "mutual release" as "[a] simultaneous exchange of releases of legal claims held by two or more parties *against each other*.") (emphasis added); *id.* at 1178 (defining "mutual" as "directed by each toward the other or others; reciprocal," and "reciprocally given, received, or exchanged"); *Pullman v. Alpha*

*Media Publ'g, Inc.*, 2014 WL 5043319, at *18 (S.D.N.Y. Mar. 14, 2014) ("Applying the plain

meaning of the term 'mutual release,' Pullman and the defendants have agreed *to release each*

*other ….*") (emphasis added), *report and recommendation adopted*, 2014 WL 5042250

(S.D.N.Y. Sept. 10, 2014).  Under Illinois law, "[a] contract's meaning must be determined from

the words or language used, and a court cannot place a construction on the contract which is

contrary to the plain and obvious meaning of the language."  *Johnstowne Ctr. P'ship v. Chin*,

458 N.E.2d 480, 481 (Ill. 1983).  "If the contract language is unambiguous, it should be given its

plain and ordinary meaning."  *Va. Sur. Co. v. N. Ins. Co. of N.Y.*, 866 N.E.2d 149, 153 (Ill.

2007); *see Reger Dev., LLC v. Nat'l City Bank*, 592 F.3d 759, 764 (7th Cir. 2010) (Illinois law)

("We construe contracts by giving their unambiguous terms clear and ordinary meaning[.]");

*William Blair & Co., LLC v. FI Liquidation Corp.*, 830 N.E.2d 760, 770 (Ill. App. 2005)

("Unless a contract clearly specifies its own meanings, a court must interpret the words of the

contract with their common and generally accepted meanings.").  Accordingly, the settlement

agreement is not contingent on Choice's releasing its claims against NRRM, because the

generally accepted meaning of "mutual release" does not include releases by third parties.

Conceding that "'mutual releases' typically refers to the release by two parties of their

claims against one another," Doc. 164 at 4, NRRM argues that because this lawsuit "involves a

complex and at times complicated interrelationship between three parties, each one of whom has

sued and been sued by the others," the court should not adopt the typical meaning, *id*. at 5.  Why

a lawsuit's complexity should affect the plain meaning of terms in a settlement agreement is left

unexplained; after all, complex cases are commonplace in federal court and also in state court.

NRRM cites no authority for its novel proposition that "mutual" means something different in

this context—other than an inapposite citation to *Shults v. Griffin-Rahn Insurance Agency, Inc.*,

550 N.E.2d 232 (Ill. App. 1990), which states only that "in order for a contract to be binding and enforceable, its terms must be definite and certain," and that "[i]n the context of insurance coverage a 'reasonable amount' is an ambiguous phrase not subject to any definite or certain interpretation." *Id*. at 235-36. There is nothing indefinite or uncertain about what a "mutual release" means in this context.

NRRM also points to discussions between NRRM's and Mepco's respective counsel to show that NRRM intended to make the settlement contingent on Choice's releasing its claims against NRRM. Doc. 164 at 3, 5. But "[i]f the language of the contract is facially unambiguous, then the contract is interpreted by the trial court as a matter of law without the use of parol evidence." *Air Safety, Inc. v. Teachers Realty Corp.*, 706 N.E.2d 882, 884 (Ill. 1999); *see In re Duckworth*, 776 F.3d 453, 456 (7th Cir. 2014) ("Illinois adopts the familiar principle that an unambiguous contract is interpreted by the court as a matter of law without use of parol evidence."); *Gallagher v. Lenart*, 874 N.E.2d 43, 58 (Ill. 2007) ("A court must initially look to the language of a contract alone, as the language, given its plain and ordinary meaning, is the best indication of the parties' intent."). Given the plain meaning of "mutual release," the lawyers' discussions are irrelevant.

"Why on earth would NRRM settle with Mepco but still have to incur the same legal fees going forward in a trial with Choice?," NRRM rhetorically asks. Doc. 164 at 2. There are many possible reasons—the relative merits of the claims and likelihood of prevailing being foremost among them, even setting aside the faulty premise that legal fees are unaffected by the number of opposing parties and claims. Anyway, NRRM's intent in settling with Mepco is immaterial: "Illinois courts have long cautioned that the parties' subjective intentions are irrelevant" when interpreting a contract. *Nat'l Prod. Workers*, 665 F.3d at 901-02 (citing *Steinberg v. Chicago*

*Med. Sch.*, 371 N.E.2d 634, 640 (Ill. 1977)). What matters, rather, is "what the parties expressed to each other in their writings, not … their actual mental processes." *Laserage Tech. Corp.*, 972 F.2d at 802. That NRRM, and maybe even Mepco, subjectively "contemplated that Mepco['s] dismissing its NRRM-based claims against Choice … would cause Choice to drop its claims against NRRM," Doc. 164 at 5, is therefore irrelevant.

As the Seventh Circuit put it, "secret hopes and wishes count for nothing." *Laserage Tech. Corp.*, 972 F.2d at 802 (internal quotation and alteration marks omitted). NRRM offered Mepco—and only Mepco—a mutual release, and Mepco accepted. That NRRM naturally expected and hoped that Choice would then voluntarily drop its claims against NRRM does not convert that secret hope, however logical and reasonable it might have been, into a contingency or "condition precedent" to the settlement agreement's enforceability. *See Liu v. T & H Mach., Inc.*, 191 F.3d 790, 798 (7th Cir. 1999) (Illinois law) ("A condition precedent must be stated expressly and unambiguously."); *Catholic Charities of Archdiocese of Chicago v. Thorpe*, 741 N.E.2d 651, 654 (Ill. App. 2000) ("a condition precedent to the formation of a contract will not be found unless the intent to create such a condition is apparent from the face of the agreement").

NRRM argues that the fifth term of its offer, "Dismissal of lawsuit with prejudice," clarifies that the mutual releases must have included Choice's release of its claims against NRRM; otherwise, how could the *lawsuit*, as opposed to only Mepco's claims, be dismissed? Doc. 164 at 6. NRRM's hyper-literal reading of "lawsuit" would lead to the absurd conclusion that the NRRM-Mepco settlement was also contingent on Choice's dropping all of its claims *against Mepco*, which also are part of this "lawsuit." "Courts will construe a contract reasonably to avoid absurd results." *Health Professionals, Ltd. v. Johnson*, 791 N.E.2d 1179, 1193 (Ill. App. 2003). As the Seventh Circuit has explained, "a contract will not be interpreted literally if

doing so would produce absurd results, in the sense of results that the parties, presumed to be rational persons pursuing rational ends, are very unlikely to have agreed to seek. This is an interpretive principle, not a species of paternalism." *Beanstalk Grp., Inc. v. AM Gen. Corp.*, 283 F.3d 856, 860 (7th Cir. 2002) (Indiana law) (citations omitted). It is implausible that NRRM and Mepco—in email exchanges bearing the subject line "NRRM/MEPCO - SETTLEMENT OFFER"— would agree to a "settlement" that was ineffective unless and until Choice dropped all of its claims against both parties. Rather, the only plausible and contextual reading of the term "lawsuit" is that the term refers to NRRM's and Mepco's claims against each another.

Alternatively, NRRM asserts that if the settlement agreement was not contingent on Choice's actions, then its lawyer lacked the authority to agree to it. Doc. 164 at 6-8. Under Illinois law, "[t]he authority of an attorney to represent a client in litigation is separate from and does not involve the authority to compromise or settle the lawsuit. An attorney who represents a client in litigation has no authority to compromise, consent to a judgment against the client, or give up or waive any right of the client. Rather, the attorney must receive the client's express authorization to do so." *Brewer v. Nat'l R.R. Passenger Corp.*, 649 N.E.2d 1331, 1333-34 (Ill. 1995); *see Magallanes v. Illinois Bell Tel. Co.*, 535 F.3d 582, 584 (7th Cir. 2008) ("Under Illinois law, an attorney has no authority to settle a claim of the client absent the client's express authorization to do so."). "An attorney's authority to agree to an out-of-court settlement will not be presumed, and the burden of proof rests on the party alleging authority to show that fact." *Magallanes*, 535 F.3d at 584; *Brewer*, 649 N.E.2d at 1334 (same).

This argument is wrong, for NRRM indisputably gave its lawyer authority to settle— including, critically, to agree to the terms memorialized in the May 30, 2013 email. As NRRM's managing member, Nicholas Hamilton, admitted, "Jeffrey [Kass, the lawyer,] had settled the

case *on the terms we authorized*." Doc. 164-2 at p. 2, ¶ 3 (emphasis added). So unlike in *Brewer*—where the plaintiff had not authorized his lawyer to agree to a settlement term requiring him to quit his job, 649 N.E.2d at 1334—NRRM concedes that it authorized its lawyer to agree to *all* of the terms of this settlement. The dispute is simply over what those terms mean under Illinois contract law.

If accepted, NRRM's position would make a mockery of Illinois contract law—for on NRRM's view, whenever parties disagreed over the meaning of a term in a settlement agreement, each could simply argue, tautologically, that its attorney never had authority to agree to the term if it meant what the other side (or the court) said it meant. No settlement agreement could ever be enforced if either party suffered buyer's remorse. This cannot be right. A party's mistake or misapprehension regarding the *meaning* of a term cannot and does not retroactively divest his lawyer of authority to have agreed to the term in the first place. *Cf. Pohl v. United Airlines, Inc.*, 213 F.3d 336, 340 (7th Cir. 2000) (Indiana law) ("Pohl's misplaced belief that he could back out of the settlement at any time prior to signing it does not entitle him to legal relief from a settlement negotiated with actual authority by his attorney."); *In re Marriage of Clarke*, 550 N.E.2d 1220, 1222 (Ill. App. 1990) ("an attorney's statements may bind the client to a settlement agreement when the client later claims to have misunderstood the terms of the settlement").

## B. Mepco's Motion for a Protective Order

In April 2014, after the close of discovery, NRRM served Mepco with a request for documents related to warranties administered by someone *other* than Choice. Doc. 174-1 at 2-3. In its brief opposing Mepco's motion to enforce the settlement agreement, NRRM hints of alleged fraud on Mepco's part regarding these other warranty administrators, Doc. 164 at 8-10, and suggests that "the [settlement] deal may ultimately have to be undone" as a result, *id*. at 8.

The new document request, NRRM says, will help it determine whether to pursue this inquiry further. *Id*. at 9. Mepco objects that the settlement agreement, if enforceable, releases *all* claims by the parties against each other, thus barring "NRRM's new theory of liability [for] additional alleged breaches of its agreement with Mepco." Doc. 174 at 2-3. The court entered and continued Mepco's motion for a protective order pending its ruling on Mepco's motion to enforce the settlement. Doc. 188.

Having now ruled on and granted Mepco's motion to enforce, the court grants Mepco's motion for a protective order, without prejudice to NRRM's moving to reopen discovery if it believes, in light of the court's rulings on Mepco's motion to enforce and on its own motion for summary judgment against Choice, that it is desirable and legally justified to do so.

## III.    Mepco v. Choice

For the second time in this lawsuit, Mepco has moved for summary judgment against Choice, and for the second time, Choice opposes summary judgment solely on the ground that Mepco has failed to adduce admissible evidence supporting its motion. Last time around, the court held that Mepco business analyst Jim Jeske's averment that Choice owed some $5.3 million to Mepco based on his "review of Mepco's business records" was inadmissible hearsay not saved by Federal Rule of Evidence 803(6). 2013 WL 4537391, at *4-5. This time around, Jeske's affidavit appears (at least at an initial glance) to cure those errors. Doc. 154-1 at pp. 4-6, ¶¶ 8-13. Nevertheless, Choice argues that even if the records reviewed by Jeske qualify under Rule 803(6), "[s]ummary judgment could only be based on the admission of the purported business records *themselves*; not [Jeske's] testimony *about the records*." Doc. 165 at 5 (emphases in original).

Choice is probably right that Rule 803(6) allows the admission only of the business records themselves, not testimony about records not in evidence. *See United States v. Florez*,

516 F. App'x 790, 794 (11th Cir. 2013) ("The records would have been admissible as an exception against hearsay under Federal Rule of Evidence 803(6)(B), but there is no hearsay exception for testimony about records not in evidence."); *Boclair v. Beardan-Monroe*, 2012 WL 3835874, at *4 (S.D. Ill. Sept. 4, 2012) ("The business record exception, however, only applies to the business *record,* not a witness' testimony referencing facts found in the business record.") (emphasis in original); *cf. United States v. Cameron*, 699 F.3d 621, 648 (1st Cir. 2012) (recognizing, in the context of a Confrontation Clause challenge, "the distinction between business records and statements *about* those records"). This is important, for Mepco has offered only Jeske's affidavit into evidence, not the underlying records.

But Mepco argues in its reply brief that Jeske's averments qualify under Rule 1006 as a "summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court." Fed. R. Evid. 1006. "If admitted this way, the summary itself is substantive evidence—in part because the party is *not* obligated to introduce the underlying documents themselves." *United States v. White*, 737 F.3d 1121, 1135 (7th Cir. 2013) (emphasis added). Rule 1006, "however, is not an end around to introducing evidence that would otherwise be inadmissible; therefore, in applying this rule, [courts] require the proponent of the summary to demonstrate that the underlying records are accurate and would be admissible as evidence." *United States v. Oros*, 578 F.3d 703, 708 (7th Cir. 2009). Furthermore, "[t]he proponent must make the originals or duplicates available for examination or copying, or both, by other parties at a reasonable time and place." Fed. R. Evid. 1006.

Choice says that Mepco has not demonstrated that Jeske's summary is accurate. Doc. 165 at 7; *see Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec*, 529 F.3d 371, 382 (7th Cir. 2008) ("The admission of a summary under Fed. R. Evid. 1006 requires a proper

foundation as to the admissibility of the material that is summarized and a showing that the summary is accurate.") (internal quotation and alteration marks omitted). Yet "the fact that [the summaries] *might* be inaccurate is not a ground for excluding them without any determination of whether they are inaccurate." *Fidelity Nat'l Title Ins. Co. of New York v. Intercounty Nat'l Title Ins. Co.*, 412 F.3d 745, 753 (7th Cir. 2005). Jeske avers that the summaries were generated "[u]sing the data from," or "based on th[e] information in," Mepco's electronic database. Doc. 154-1 at p. 8, ¶¶ 20, 23. If the information in the database qualifies as a business record—a matter on which the court is not ruling at this juncture—then Jeske's generating his calculations based on that information, combined with his sworn declaration that his calculations are "true and correct," *see id.* at 9, might be sufficient to establish its accuracy. *See Trustees of Chicago Plastering Inst. Pension Trust v. Cork Plastering Co.*, 570 F.3d 890, 901 (7th Cir. 2009) ("The report, as we have discussed, merely tabulates data from G & J's records to show what the company might owe given certain assumptions."); 6 *Weinstein's Federal Evidence* § 1006.05[3], p. 1006-20 (2d ed. Rel. 93-10/2008) ("Courts have facilitated the authentication process by allowing supervisory personnel to attest to the authenticity and accuracy of charts, summaries, or calculations in situations where many individuals, or possibly computers or other machines, are used to prepare the exhibits."); *cf. Judson Atkinson*, 529 F.3d at 382 (holding that the district court did not abuse its discretion in striking a summary that had not been authenticated).

Besides, the reason for Rule 1006's "reasonable time and place" requirement is precisely so that "the opposing party has adequate time to examine the records to check the accuracy of the summary." *United States v. Isaacs*, 593 F.3d 517, 527 (7th Cir. 2010) (internal quotation marks omitted). If Choice had substantive concerns about the accuracy of Jeske's calculations, it could have raised them in its Local Rule 56.1(b)(3)(B) response or Local Rule 56.1(b)(3)(C) statement,

or in its brief opposing summary judgment, and the court would have drawn all reasonable inferences in its favor. *Cf. United States v. Swanquist*, 161 F.3d 1064, 1073 (7th Cir. 1998) ("Swanquist had ample opportunity during his cross-examination of Agent Sebo to elicit any facts that might have suggested that the government's charts incorrectly captured the nature of his Champion Bank loans.").

That said, Choice complains that Mepco never identified, much less made available, the underlying records. In its reply brief, Mepco, for the first time, points to Jeske's February 2013 deposition, during which he allegedly identified the electronic data and provided copies of it to NRRM and Choice. Doc. 172 at 9-10. Perhaps realizing the impropriety of this tack, Mepco also moved to file a short additional brief and to amend its Local Rule 56.1(a)(3) statement, Doc. 186, this time including an additional declaration from Jeske averring that the underlying data referenced in his previous affidavit "was produced electronically in a series of four data files" at his deposition. Doc. 186-2 at p. 82, ¶ 3. Choice's objection to the admissibility of Jeske's calculations thus appears to be somewhat disingenuous; Choice was perfectly aware of which data Jeske relied on to make his calculations, and has had a copy of the files since at least February 2013.

Mepco's motion to file its short additional brief and to amend its Local Rule 56.1(a)(3) statement is therefore granted, and its motion for summary judgment is entered and continued. Choice will be permitted to respond to the additional brief and revised Local Rule 56.1(a)(3) statement, contained at Docs. 186-1 and 186-2, and also to file a new brief opposing summary judgment, without prejudice to its re-raising evidentiary or any other substantive grounds for denial.

**Conclusion**

NRRM's motion for summary judgment is granted. Mepco's motion to enforce its settlement agreement, motion for a protective order, and motion to file a response to Choice's surreply and an amended Local Rule 56.1(a)(3) statement are also granted, while its summary judgment motion is entered and continued. Choice has until April 17, 2015, to file its Local Rule 56.1(b)(3)(B) response to Mepco's amended Local Rule 56.1(a)(3) statement and to file a supplemental brief in opposition to Mepco's summary judgment motion.

March 27, 2015                                    _____
                                                         United States District Judge